**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DANIELLE OAKLEY, | : | CIVIL ACTION NO. |
| Plaintiff, | : | |
| v. | : | **JURY TRIAL DEMANDED** |
| SPRINT CORPORATION and T-MOBILE USA, INC. | : | |
| | : | SEPTEMBER 30, 2020 |
| Defendant. | : | |

**COMPLAINT**

**JURISDICTION AND VENUE**

1. This action arises under the Family Medical Leave Act (FMLA), 29 U.S.C.A. § 2615, and § 2612; the Americans with Disabilities Act Amendments Act (ADAAA), 42 U.S.C. § 12101 et seq; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2; Connecticut General Statues § 46A-60(b)(1); and Connecticut State Law.

2. The jurisdiction of this court is founded upon 28 U.S.C. §1331 (federal question) and the provisions of 28 U.S.C. §1343.

3. Venue is proper in the District of Connecticut pursuant to 28 U.S.C. §1391(b) in that the claims arose in this district and Plaintiff resides in this district.

4. Supplemental jurisdiction over Plaintiff's supplemental state law claims are invoked pursuant to 28 U.S.C. §1367 as the claims arise out of the same transaction and occurrences as Plaintiff's federal claims.

THE McMINN EMPLOYMENT LAW FIRM, LLC
1000 Lafayette Boulevard, Suite 1100 ▪ Bridgeport, CT 06604 ▪ T: (203) 683-6007 ▪ F: (203) 683-9881

5. Costs, expert witness fees, and attorney's fees are sought pursuant to 42 U.S.C. §1988.

6. The Plaintiff received a Notice of Right to Sue on July 10, 2020, and Release of Jurisdiction on July 7, 2020.

## PLAINTIFF

7. The Plaintiff, Danielle Oakley ("Plaintiff" or "Oakley") resides at 585 Ellsworth St. Apt 4L, Bridgeport, CT 06605.

## DEFENDANTS

8. The Defendant, Sprint Corporation ("Sprint"), is a foreign corporation, headquartered in Kansas, and conducts substantial business within the State of Connecticut at various locations in Connecticut, including, 2071 Black Rock Turnpike, Fairfield, Connecticut and 125 Boston Post Road, Orange, Connecticut. Plaintiff was employed at both locations.

9. The Defendant, T-Mobile USA, Inc. ("T-Mobile") is a foreign corporation, incorporated in Delaware, headquartered in Washington, is registered to conduct business in the State of Connecticut, and conducts substantial business in Connecticut at 2071 Black Rock Turnpike, Fairfield, Connecticut and 125 Boston Post Road, Orange, Connecticut, where Plaintiff was employed.

10. As of April 1, 2020, Sprint, is now 100% owned by T-Mobile, herein collectively referred to as "Defendants."

11. Defendants employ more than twenty (20) employees.

**FACTUAL ALLEGATIONS**

12. Plaintiff was hired by Sprint on January 5, 2018.

13. Plaintiff was most recently fulfilling the position of Retail Consultant at Defendants Fairfield location, which she performed in a satisfactory manner.

14. Plaintiff earned significant achievements throughout her tenure, such as top sales performers in the nation in multiple categories.

15. From the onset of Plaintiff's employment, and specifically, at the interview for her position, Plaintiff informed Sprint that she is a single mother of a young child with special needs.

16. In June of 2018, Plaintiff was informed that Sprint's Store located in Orange was short-staffed at the time, and therefore, she was going to be transferred to provide support to that location.

17. As a reliable team member, one who was always ready and willing to help in any business need Plaintiff agreed to transfer to the Orange store.

18. Prior to her transfer to the Orange location, Plaintiff met with the District Manager, Andrew and the Store Manager in Orange, Jerimi Garcia ("Garcia"), along with Turell Hiclles ("Hiclles") Store Manager, to ensure that she did not have any issues with Orange's management team accommodating her schedule in order to take care of her special needs child.

19. Thereafter, Plaintiff formally transferred to Sprint's Orange location where she continued to perform the duties of her position in a satisfactory manner in a full-time capacity.

20. Up until this time, Plaintiff's child had been hospitalized for a considerable amount of time at a full-time facility due to his Family Medical Leave Act (FMLA), qualifying serious health condition.

21. Once Plaintiff was informed that her child would be released from this facility, she spoke to Garcia, in or about the beginning of July of 2018, and informed him that she needed to work part-time in order to take care of her special needs' child, who would now be spending more time at home.

### A. Sequel to Informing Garcia that She Required a Part-time Schedule to Take Care of Her Special Needs' Son — Plaintiff was Treated Disparately

22. For instance, Plaintiff began to notice that sales she had begun would be credited to other employees when the customer completed the sale.

23. Previously, when Plaintiff began the sale if the customer returned and another employee finalized the sale Plaintiff was still credited — but, not anymore.

24. Garcia also began overly critiquing Plaintiff's work performance.

25. Garcia also began giving many of Plaintiff's earned sales to John/Jean (no known disability), a newer Retail Consultant; making him appear more productive and Plaintiff less productive.

26. This negatively affected Plaintiff's monthly goals which could lead to performance concerns and even termination.

27. Plaintiff also began to be excluded from group meetings and work-related chat – essentially, Plaintiff became ostracized.

28. Despite this, the Plaintiff, a team player to the core, continued to work every day putting in her best effort.

### B. Plaintiff is Pointedly Discriminated Against Because of her Association with A Child With a Disability and Status as a Single Parent

29. Plaintiff was never asked to take part in Sprint's special events because Plaintiff was told, "well **with your son being the way he is** we're going to have the other reps (representatives) take care of it."

30. One day, during the school year of 2018, Plaintiff had completed her shift but returned to the store because she had forgotten her coffee. At that time, Plaintiff overheard Garcia making highly inappropriate, discriminant, and outright offensive comments about her special needs' son.

31. Specifically, as Plaintiff was about to enter the backroom, she heard Garcia state to John/Jean, another employee, "if she thinks for one fuc\*\*ng second that while she's at home taking care of her **retarded son**, I'm going to take care of her customers for her, she's crazy."

32. John responded stating: "I don't mind helping her, I have one coming" (presumably referring to his child).

33. Garcia further stated, "well, her and her **stupid kid** can take her shit elsewhere."

34. Plaintiff then walked in and Garcia's face was stunned, likely hoping that she did not overhear his horrific discriminatory comments about her son.

35. The next day, Garcia pretended to be nice to Plaintiff, in his best efforts to erase his prior day's misconduct.

36. Finally, Kenneth Bull ("Bull"), the Assistant Manager of the Orange store at that time, in a glimmer of hope, told Plaintiff that he could put her in for a transfer back to Sprint's Fairfield location if she wanted—the store Plaintiff was at previously.

37. Plaintiff confirmed that her part-time schedule would remain in effect if she accepted the transfer, and in February of 2019, Plaintiff was transferred back to Sprint's Fairfield location, working part-time.

38. In Fairfield, Plaintiff had thought things would be better again — she was mistaken.

39. In Fairfield, the new Store Manager was Evelyn Allen ("Allen").

40. Allen immediately made her position clear when it came time to accommodate employees—the store's goals came first.

41. Allen stated to Plaintiff, "I am going to honor your part-time schedule—but I don't like it—I'd rather have you here on weekends."

42. In September of 2019, Plaintiff informed Allen that she could work full-time again because her fiancé was going to be able to help her care for her special needs' child.

43. Plaintiff then worked full-time from in or about September 2019 through the end of October/early November of 2019.

44. However, for some inexplicable reason, Allen kept Plaintiff as a part-time employee in the system and did not change Plaintiff's status until she worked several weeks of full-time hours.

45. Unfortunately to Plaintiff detriment, a new development came up and Plaintiff no longer had someone to help her take care of her special needs' child.

46. Plaintiff then sought an accommodation because she needed time to take care of her son and his disabilities. Specifically, Plaintiff requested that she be accommodated in that Sprint schedule her part-time again.

### C. Defendants Were Fully Aware of Plaintiff's Special Needs Son, Despite Adamantly Denying Such Knowledge

47. In late October/early November, Plaintiff verbally informed Allen of her need to be scheduled part-time because of her son's disability.

48. In its sworn statement to the Connecticut Commission on Human Rights and Opportunities (CHRO), dated April 27, 2020, Defendant <u>denies being aware</u> of the fact that Plaintiff's son had special needs.

49. Yet, Defendant's position is undercut in an irrefutably documented email from the Plaintiff to Allen, dated November 15, 2019, which Plaintiff states,

    > As you may know my son is in a **special needs program** and his schedule is variable and has certain time restrictions. Unfortunately his current caretaker will be moving on to different employment starting 12/02/2019. This means that I regretfully need to return to work part-time with weekend restrictions.

    (emphasis supplied)

50. Defendant's sworn answer to the CHRO also states that "Ms. Allen **was** particularly sensitive to Complainant's situation," which indicates that Allen was aware of Plaintiff's need for accommodation given her son's serious health condition. (emphasis added) (Answer to Complaint ¶ 50).

51. Not having heard back from Allen, Plaintiff emailed her again (*documented*) a week before Thanksgiving, reminding her that she needed to take care of her son — who has a qualifying ADA disability and an FMLA qualifying serious health condition.

52. Again, Plaintiff's <u>second</u> email was met with silence by Allen.

53. After failing to respond to Plaintiff's email regarding her seven-year-old special needs son, in short proximity after her request, Allen showed up at Sprint's Fairfield

location on November 30, 2019, and immediately terminated Plaintiff's employment.

54. Desperate to find a solution that allowed her to keep her job, Plaintiff inquired to Allen about her options to apply for an FMLA job-protected leave.

55. Allen and Human Resources informed Plaintiff that she was not eligible for FMLA because of her part-time status.

56. Estimated numbers show Plaintiff's eligibility in regard to the time required to apply for FMLA:

- Full-time January 5, 2018, through July 1, 2018, = 25 Weeks
- 25 weeks x 40 hours per week= 1,000 hours
- Part-time July 1, 2018, through November 30, 2019, = 69 Weeks
- Monday through Friday 9:30 am to 2:30 pm = 5 daily hours
- 5 hours a day x 5 days a week = 25 hours a week
- 69 weeks x 25 hours per week = 1,725 hours
- Total hours = 1000 + 1,725 = 2,725

57. Plaintiff had approximately 2,725 work hours that prove not only that she did have the time required, and that Allen deterred Plaintiff from utilizing FMLA.[1]

58. Had Plaintiff been offered FMLA she would have had adequate time to make childcare arrangements to return to work, full-time within 12 weeks of the date of her termination. Instead, she was terminated.

---

[1] These estimated numbers do not take into consideration that during the period of time between September and early November Plaintiff worked on a full-time schedule, ad had been classified as part-time.

59. Allen also pointedly stated to Plaintiff, "we could take you back full-time again **when you don't have any restrictions with your son**, but we have to let you go," another acknowledgment of awareness of her son's disability.

60. Plaintiff asked Allen if she could have a meeting with the District Manager, Mark Waschbusch, regarding this situation and Allen immediately denied her request.

61. As a consequence of Allen's discriminatory and harassing conduct, along with the negligence of Defendants' management, Plaintiff was diagnosed with severe panic attacks disorder.

## COUNT ONE

### INTERFERENCE WITH FMLA RIGHTS,
### IN VIOLATION OF 29 U.S.C.A. § 2615
### AGAINST ALL DEFENDANTS

62. Plaintiff hereby incorporates paragraphs 1-61 with the same force and impact as if fully set forth herein.

63. The Defendant is considered an employer under the FMLA, employing over fifty employees.

64. The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" an eligible employee's rights under the FMLA. 29 U.S.C.A. § 2615(a)(1).

65. The FMLA guarantees eligible employees 12 weeks of leave following certain events such as to care for a family member's serious illness. 29 U.S.C. § 2612(a)(1).

66. Plaintiff had a serious need to take care of her son with special needs.

67. Defendants were fully aware of Plaintiff's special needs son, as it was informed verbally and documented in an email, dated November 15, 2019.

68. Plaintiff was eligible and entitled to leave under the FMLA, due to the need to attend to her son's medical needs, who had a qualifying "serious health condition." Needed to care for encompasses both physical and psychological care. It includes, for example: Providing care for a qualifying family member who, because of a serious health condition, is unable to care for his or her own basic medical, hygienic, nutritional or safety needs, or is unable to transport himself or herself to the doctor, etc.

69. The Defendant's interference with Plaintiff's FMLA rights includes, but is not limited:

    (a) Failing to notify Plaintiff of her FMLA rights, after learning of a qualifying serious health condition.
    (b) Denial of FMLA.
    (c) Terminating Plaintiff's employment on November 30, 2019, during a time when she qualified for and should have been permitted to utilize FMLA job-protected leave.

70. Had Plaintiff been offered FMLA she would have had adequate time to make childcare arrangements for her disabled son and return to work, full-time within 12 weeks.

71. As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages, including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

72. Plaintiff's rights were violated under the FMLA, 29 U.S.C.A. § 2615, as described above.

73. Plaintiff is seeking damages as a result of Defendants' unlawful conduct.

## COUNT TWO

### RETALIATION,
### FOR EXERCISING FMLA RIGHTS IN VIOLATION OF 29 U.S.C. § 2612(A)(1) AGAINST ALL DEFENDANTS

74. Plaintiff hereby incorporates paragraphs 1-73 with the same force and impact as if fully set forth herein.

75. Plaintiff was entitled to FMLA to take of her son who had a qualifying serious health condition.

76. The Defendant's retaliation for Plaintiff asserting her FMLA rights, includes, but is not limited to, terminating Plaintiff's employment on November 30, 2019, during a time when she qualified for and should have been permitted to utilize FMLA job-protected leave.

77. Plaintiff engaged in protected activities pursuant to her rights under the FMLA.

78. The Defendant committed an adverse employment action against Plaintiff due to her engagement in protected activities.

79. As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages, including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

80. Plaintiff is seeking damages as a result of Defendants' unlawful conduct.

## COUNT THREE

### ASSOCATIONAL DISCRIMINATION,
### IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### AGAINST ALL DEFENDANTS

81. Plaintiff hereby incorporates paragraphs 1-80 with the same force and impact as if fully set forth herein.

82. The ADA prohibits employers from taking adverse employment action because of the known disability of an individual with whom the qualified individual is known to have a relationship or association.

83. Defendant was fully aware of Plaintiff's association to an individual with a serious health condition, her son.

84. In its sworn statement to the Connecticut Commission on Human Rights and Opportunities (CHRO), dated April 27, 2020, Defendant <u>denies being aware</u> of the fact that Plaintiff's son had special needs.

85. Yet, Defendant's position is undercut in an irrefutably documented email from the Plaintiff to Allen, dated November 15, 2019, which Plaintiff states,

> As you may know my son is in a **special needs program** and his schedule is variable and has certain time restrictions. Unfortunately his current caretaker will be moving on to different employment starting 12/02/2019. This means that I regretfully need to return to work part-time with weekend restrictions.

> (emphasis supplied)

86. Defendant's sworn answer to the CHRO also states that "Ms. Allen **was** particularly sensitive to Complainant's situation." which means that Allen was aware of Plaintiff's need for accommodation given her son's serious health condition. (emphasis added) (Answer to Complaint ¶ 50).

87. The Plaintiff suffered discriminatory treatment and an adverse employment action due to her association with her special needs' child, including, but not limited to:

   a) Her sales being intentionally credited to other employees when the customer completed the sale.

   b) Overly critiquing Plaintiff's work performance.

   c) Giving many of Plaintiff's earned sales to John/Jean (no known disability), a newer Retail Consultant; making him appear more productive and Plaintiff less productive.

   d) Being excluded from group meetings and work-related chat – essentially, Plaintiff became ostracized.

   e) Plaintiff was never asked to take part in Sprint's special events because Plaintiff was told, "well with your son being the way he is we're going to have the other reps (representatives) take care of it."

   f) Garcia stating about Plaintiff, "if she thinks for one fuc**ng second that while she's at home taking care of her **retarded son**, I'm going to take care of her customers for her, she's crazy."

   g) Garcia further stating, "well, her and her **stupid kid** can take her shit elsewhere."

   h) Being told by Allen immediately after learning of her need to take of her son— the store's goals came first.

   i) Terminating Plaintiff's employment on November 30, 2019.

   j) Allen stating to Plaintiff, "we could take you back full-time again **when you don't have any restrictions with your son**, but we have to let you go," another acknowledgment of awareness of her son's disability.

-13-

88. Defendants' conduct is unlawful and in violation of the Americans with Disabilities Act.

89. As a result of the Defendants' unlawful conduct, Plaintiff has suffered, and will continue to suffer damages, including but not limited, to substantial lost wages, fringe benefits, health insurance, retirement and pension benefits, mental and emotional distress and the ability to enjoy life's pleasures.

90. Plaintiff seeks damages as a result of Defendants' unlawful conduct.

## COUNT FOUR

### RETALIATION, FOR CHILD WITH DISABILITY IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AGAINST ALL DEFENDANTS

91. Plaintiff hereby incorporates paragraphs 1-90 with the same force and impact as if fully set forth herein.

92. Defendants' retaliatory conduct was motivated by Plaintiff's association with her need for an accommodation to take care of her son with special needs.

93. Defendants' conduct is unlawful and in violation of the Americans with Disabilities Act.

94. As a result of the Defendants' unlawful conduct, Plaintiff has suffered, and will continue to suffer damages, including but not limited, to substantial lost wages, fringe benefits, health insurance, retirement and pension benefits, mental and emotional distress and the ability to enjoy life's pleasures.

95. Plaintiff seeks damages as a result of Defendants' unlawful conduct.

## COUNT FIVE

### VIOLATION OF CONN. GEN. STAT §46A-60(B)(1)
### (SINGLE PARENT MARITAL STATUS)
### AGAINST ALL DEFENDANTS

96. Plaintiff hereby incorporates Paragraphs 1-95 with the same force and impact as if fully set forth herein.

97. Defendant harassed, discriminated against Plaintiff, and terminating her employment due to her single-parent marital status.

98. Defendants' conduct is unlawful and in violation of Conn. Gen. Stat. §46a-60(b)(1).

99. As a result of the Defendants' unlawful conduct, Plaintiff has suffered, and will continue to suffer damages, including but not limited, to substantial lost wages, fringe benefits, health insurance, retirement and pension benefits, mental and emotional distress and the ability to enjoy life's pleasures.

100. Plaintiff seeks damages as a result of Defendants' unlawful conduct.

### PRAYER FOR RELIEF

Wherefore the Plaintiff prays that this court award:

1. Money damages;
2. Costs;
3. Punitive damages, attorney fees, and expert witness fees;
4. Pre-judgment interest
5. Trial by jury; and
6. Such other relief as the Court deems just, fair, and equitable.

THE PLAINTIFF,
DANIELLE OAKLEY


By: _____/s/_____
    Michael C. McMinn (#ct267169)
    **THE MCMINN EMPLOYMENT LAW FIRM, LLC**
    1000 Lafayette Blvd., Suite 1100
    Bridgeport, CT 06604
    Tel: (203) 683-6007
    Fax: (203) 680-9881
    michael@mcminnemploymentlaw.com

    *COUNSEL FOR PLAINTIFF*